### In re MARTIN'S AQUARIUM, INC., Debtor.

### Arthur P. LIEBERSOHN, Trustee for the Estate of Martin's Aquarium, Inc., Plaintiff,

v.

### Joel M. and Lois ZISHOLTZ Individually and t/d/b/a Martin's Aquarium, Inc. and t/d/b/a Aquatic Design and Maintenance, Inc., Martin's Aquarium, Inc. Aquatic Design and Maintenance, Inc., Defendants.

Bankruptcy No. 98–11455 DAS.
Adversary No. 98–312.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Oct. 16, 1998.

David B. Smith, Philadelphia, PA, for Debtor.

Arthur P. Liebersohn, Philadelphia, PA, for Trustee.

Michael H. Kaliner, Fairless Hills, PA, General Counsel for Trustee.

George Bochetto, Philadelphia, PA, Special Counsel for Trustee.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, for United States Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before us in the involuntary Chapter 7 corporate bankruptcy of MAR-

TIN'S AQUARIUM, INC. ("MAI"), are (1) an adversary proceeding ("the Proceeding") in which ARTHUR P. LIEBERSOHN, TRUSTEE FOR THE ESTATE OF MARTIN'S AQUARIUM, INC. ("the Trustee"), seeks to avoid an alleged fraudulent conveyance of the aquarium service component of Martin's business by JOEL M. ZISHOLTZ ("the Debtor") and LOIS M. ZISHOLTZ ("Lois;" with the Debtor, "the Debtors") to Defendant AQUATIC DESIGN & MAINTENANCE, INC. ("ADI"), and to obtain an accounting and injunctive relief in connection therewith; and (2) a motion of the Debtors seeking sanctions pursuant to Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 9011 against Rhona Goldstein ("Rhona") for certain alleged misrepresentations which she asserted in a predecessor motion to the Proceeding ("the 9011 Motion").

We conclude that the Trustee has established that the Debtors did effect both an actual and constructive fraudulent conveyance of MAI's lucrative service business to ADI, in violation of both federal and applicable state law. We fully grant the relief of an accounting, and also provide injunctive relief designed to preserve the status quo while we have the parties address the issue of appropriate further relief. The 9011 Motion, previously deferred until we had the benefit of hearing the Proceeding, is denied because we find that Rhona did not overstate the culpability of the Debtors in the underlying fraudulent conveyance.

## B. PROCEDURAL AND FACTUAL HISTORY

On January 13, 1998, the Debtors filed a joint Chapter 13 bankruptcy case. On January 30, 1998, Rhona filed a motion to convert this case to Chapter 7 because her own unsecured claim in excess of $400,000 rendered the Debtors ineligible for Chapter 13 under 11 U.S.C. § 109(e).

Rhona, her husband Robert ("Robert;" with Rhona, "the Goldsteins"), and Richter Paper Co. then filed an involuntary Chapter 7 petition against MAI on February 3, 1998. Relief was ordered in MAI's case on February 16, 1998.

On April 2, 1998, the Debtors, on their own motion filed in response to Rhona's conversion motion, successfully converted their case to Chapter 11 instead of to Chapter 7. The Debtors filed a Plan and Disclosure Statement in their case on July 1, 1998. When numerous objections emerged at a confirmation hearing of September 29, 1998, that hearing was continued until November 4, 1998, to allow the Debtors to formulate an amended plan by October 23, 1998.

Two false starts were made in pursuing the principal relief requested in the Proceeding. First, on February 17, 1998, the Goldsteins moved for "accounting and preservation" of MAI's estate, which we denied on the ground that the Trustee was the sole party entitled to pursue such relief. Then, after the Goldsteins' attorney was retained as special counsel by the Trustee, that counsel caused a motion of the Trustee and Rhona to impose a constructive trust and seek an accounting and turnover to be filed against the Debtors in their case on April 30, 1998 ("the Constructive Trust Motion"). The Constructive Trust Motion was withdrawn on May 27, 1998, and refiled in the more proper procedural posture of this Proceeding in MAI's case on June 16, 1998.

The Debtors filed the 9011 Motion, captioned in both their case and that of MAI, on June 1, 1998, naming the Trustee as well as Rhona and her counsel as respondents. At a hearing on July 1, 1998, on the Motion, at which the Debtors withdrew any claims against the Trustee, we deferred its resolution until the initial scheduled trial date of the Proceeding of August 13, 1998. After denying a motion of the Debtors to dismiss the Proceeding on August 3, 1998, we approved the parties' agreement to continue the trial of the Proceeding until September 1, 1998.

After a trial of about four hours addressing principally the Proceeding but also the 9011 Motion on the latter date, we allowed the parties until September 18, 1998, to simultaneously file briefs addressing the merits of both of these matters.

The Trustee called as witnesses at trial Christine Hamilton, MAI's bookkeeper from May 26, 1996, to the closure of its large

aquarium and fish supply store in Jenkintown, PA., in late December 1997; Rhona; and the Debtor. The Defendants recalled the Debtor and also called Deborah DiPaolantonio, the manager of MAI's service business for over ten years, who began her employment in 1981, as their witnesses.

The Debtor provided most of the testimony. He stated that he first became involved with the MAI store in 1969, and annexed the service business by taking over Ocean Interiors, a business commenced by Lois, in the mid–1980's.

In late 1995 the Debtors approached the Goldsteins, formerly his customers, about their becoming investors and partners in MAI. In early 1996 Robert began working full-time at MAI's store as a means of learning about its operations. Apparently satisfied by this experience, Rhona and the Debtors, on April 24, 1996, executed a brief handwritten document which states as follows:

> I(we) Lois Zisholtz and Joel Zisholtz accept this check in the amount of _____ as part of a loan of up to and including 300,000, to be repaid to Merrill Lynch at their prime in ten years. This initial loan is secured by the property known as 101–111 Old York Road, Jenkintown, PA 19046 and assumption of lease at 111 Old York.
>
> The intent of the loan entitles Rhona Goldstein to 50% asset ownership of Martins [sic] Aquarium Inc. and Ocean Interiors, 50% shares of their stock + 50% of the above mentioned properties.

We note that the Debtor nevertheless at all times continued to own all of MAI's stock and that the Jenkintown property in which MAI's store was located has at all pertinent times been owned by RPJ Associates, a partnership of which the Debtors are the sole general partners.

Thereafter, the Goldsteins withdrew over $400,000 from their Merrill Lynch investment account referenced in the foregoing document and contributed this and other sums towards the business. Robert continued to work full-time in a managerial position at MAI's store, apparently without compensation.

Disagreements among the Goldsteins and the Debtor surfaced in early 1997, the original basis for which was never fully explained. The Goldsteins apparently believe that, once he had their money, the Debtor's use for them diminished and he wished to dispose of them. The Debtor claims that Robert, who apparently served as MAI's financial officer, mismanaged the business in some unspecified manner. The Debtor clearly intended that, in his arrangement with the Goldsteins, he would continue to receive his salary of $2000 weekly, plus the rental of a Mercedes Benz automobile, in order that he could maintain, *inter alia*, the Debtors' $3500 monthly mortgage on a suburban Berks County home worth approximately $500,000.

In spring 1997 the customer providing 80 percent of MAI's service business, the Bloomberg, L.P. investment firm ("Bloomberg"), which had executed an Aquarium Maintenance Service Contract with MAI, signed by the Debtor, on December 31, 1996, escalated its purchases of fish for new larger tanks in its Princeton office. Since MAI was having difficulty paying its bills, a bill for fish supplied to Bloomberg was not paid by Robert. This led to further arguments among the Goldsteins and the Debtor, culminating in the Debtor's threats of unilateral actions to protect his interests.

On May 12, 1997, without prior notice to the Goldsteins, the Debtors formed ADI and transferred all of MAI's service business, employees, and assets to it. During a transition period over the next month or two, MAI continued to pay certain bills of ADI. Although DiPaolantonio produced handwritten monthly reports which purported to show that MAI received about $5000 more funds from ADI than ADI obtained from MAI through December 1997, those records appear very informal and were admittedly not supported by original documents. In fact, DiPaolantonio testified, with obvious personal reservations about their accuracy, that they were prepared at the Debtor's direction.

After he unilaterally removed the service business from MAI, the Debtor proposed to the Goldsteins that they buy MAI's remaining retail business from him for $350,000. In

early August, however, the Goldsteins apparently decided to cut their losses and walk away from MAI's business. The Debtor then took over the MAI's store until December 1997. Just before Christmas he heavily advertised and thereafter conducted a going-out-of-business sale in which he realized gross receipts of approximately $68,000. The Debtor admittedly retained the net funds of over $55,000 to spend on his personal obligations.

The Debtor has thereafter continued to operate ADI, drawing a $2500 weekly salary and retaining DiPaolantonio as a managerial employee, among other former MAI employees. Rhona commenced a state court action against the Debtors to attempt to undo the alleged transfer of MAI's assets to ADI which are at issue in the Proceeding. She obtained a temporary restraining order preventing any further transfers of any assets formerly belonging to MAI. A hearing on a motion for a preliminary injunction, apparently seeking the broader relief of invalidation of the transfer and an accounting, was halted by the Debtors' bankruptcy filing.

In our assessment of the parties' testimony, we conclude that the credibility of the Debtor is particularly suspect. His driving motivation appears to be to preserve his own income in excess of $100,000 annually in order to support his luxurious lifestyle, with little concern for the rights of others. The highly credible Hamilton and DiPaolantonio presented themselves as subordinates whose record-keeping was accomplished solely to serve the needs of the Debtor as he directed and not by any sort of accounting principles. Although DiPaolantonio remains as an employee of the Debtor, she did not appear to support all his actions nor his treatment of the Goldsteins, stating that she liked all of the parties and, like Hamilton, she was shocked at the Debtor's sudden transfer of the lucrative service business of MAI to ADI.

This having been said, we hesitate to beatify the Goldsteins. Only Rhona testified and her testimony was rather brief. Most of the

transactions and motions were rather suspiciously put solely in her name. The motivations for their significant investment in MAI, under terms set forth in only the crudest homemade documentation, see pages 871–872 *supra*, remains unexplained. On several occasions during the trial, the Debtor attacked Robert, not for specific misdeeds in connection with MAI, but as an alleged drug dealer who has obtained considerable income from illegal activities. We speculate that certain aspects of Robert's past may be rather unappealing, therefore causing him to refrain from presenting otherwise apparently relevant testimony and from lending his name to the transactions. In any event, Robert's failure to testify, although he was present at trial, left certain unanswered questions in our mind. Also, we note a gap in the record recently uncovered by this court is that MAI's Schedules were never filed, thereby eliminating reference to the normative bankruptcy court source for its complete financial picture.

We are nevertheless easily able to reach certain legal conclusions on this record, although, in forming an order for relief, we are forced to be somewhat tentative for two reasons. First, we require more information concerning the finances of MAI and ADI, compiled by a certified accountant. Second, we are concerned with poisoning the only valuable business remaining, *i.e.*, ADI'S service business, as well as providing remedies to parties impacted by the Debtor's wrongful deeds.

### C. DISCUSSION

1. *The Trustee's Contention That the Debtor's Appropriation of MAI's Service Business Is an Avoidable Fraudulent Conveyance Is Well Supported by the Record.*

Refraining from asserting the straightforward claim that the Debtors simply converted the most lucrative portion of MAI's business to their own use,[1] the Trustee relies instead on claims that the Debtor's

---

1. "Conversion is an act of willful interference with the dominion or control over a chattel, done without lawful justification, by which any person entitled to the chattel is deprived of its use and

possession." *Baram v. Farugia*, 606 F.2d 42, 43 (3d Cir.1979). The Debtor's acts in appropriating MAI's service business to their own use would certainly appear to satisfy this definition.

seizure of the service component of MAI's business constituted a fraudulent conveyance. More specifically, the Trustee argues that the Debtor's appropriation of MAI's service business constituted an actual fraudulent conveyance under federal bankruptcy law, 11 U.S.C. § 548(a)(1) and, through 11 U.S.C. § 544(a), *see, e.g., In re Frascatore,* 98 B.R. 710, 716 (Bankr.E.D.Pa.1989), under applicable state law, 12 Pa.C.S. § 5104(a)(1). He alternatively asserts that the requirements for a constructive fraudulent conveyance under federal bankruptcy law, 11 U.S.C. § 548(a)(2), and under applicable state law, 12 Pa.C.S. § 5104(a)(2), have been established. The federal law in question reads as follows:

### § 548. Fraudulent transfers and obligations

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured....

The applicable state law provides as follows:

### § 5104. Transfers fraudulent as to present and future creditors.

(a) General rule.—A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The Debtors oppose the actual fraudulent conveyance claims principally by asserting that there is no evidence that the transfer was made to avoid hinder or delay creditors, but rather was effected to save the remains of MAI's business. The constructive fraudulent conveyance claim is opposed principally by the contention that the MAI's insolvency as of the critical time of the May 12, 1997, transfer was not proven and that, since the value of the assets transferred to ADI was not proven, it was impossible to ascertain that "reasonably equivalent value" was not obtained by MAI in exchange for the transfer.

■ There is superficial appeal to the argument that the transfer at issue, though driven by the base motive of misappropriating MAI's most valuable asset, was not the precise equivalent of the base motive of defrauding MAI's creditors. However, the Goldsteins, as persons who have a prepetition "claim" against MAI, are clearly "creditors" of MAI. *See* 11 U.S.C. § 101(10)(A). Al-

though the Debtors argue that their contributions to MAI were in the nature of investments rather than loans, this argument is considerably weakened by the fact that the Goldsteins never obtained an ownership interest in MAI and that the obligation is designated as a "loan" in its only documentation. *See* pages 871–872 *supra.* Given the broad definition of the term "claim," *see, e.g.,* 11 U.S.C. § 101(5); and *Johnson v. Home State Bank,* 501 U.S. 78, 73–88, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), we find that the Goldsteins have established that they have a claim against MAI. There is little question that the Debtors, by removing the crown jewel of MAI's assets, effected the transfer with an actual intent of hindering and delaying the Goldsteins' ability to collect their claims against MAI or themselves.

■■■ The obvious enmity which the Debtor bore towards the Goldsteins may have been sufficient to establish that the transfer was purposely made to delay or hinder their collection of their claims against MAI. However, assuming *arguendo* that the intent requisite to support a claim of an actual fraudulent conveyance were not otherwise proven, the Trustee resorts to the list of "badges of fraud" recognized under cases interpreting 548(a)(1) and the list of similar factors relating to ascertainment of fraudulent intent which are listed in 12 Pa.C.S. § 5104(b). The § 548(a)(1) badges, as referenced in, *e.g., In re Main, Inc.,* 213 B.R. 67, 79 (Bankr. E.D.Pa.1997) (*"Main I"*), *aff'd in part & rev'd & remanded in part on other grounds sub nom. In re Blatstein,* 226 B.R. 140, 1998 WL 651620 (E.D.Pa. Sept. 23, 1998) (*"Blatstein"*), are as follows:

(1) lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention or possession, benefit or use of the property in questions, although title exists in another entity;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) conveyance of all of the debtor's property;

(6) secrecy of the conveyance;

(7) existence of a trust or trust relationship between the debtor and the person to whom the property was conveyed;

(8) the existence or cumulative effect of a pattern of series of transactions or a course of conduct after the incurring debt, onset of financial difficulties, or pendency or threat of suit by creditors;

(9) the instrument affecting the transfer suspiciously states it is in fact bona fide;

(10) the debtor makes a voluntary gift to a family member; and

(11) the general chronology of events and transactions under inquiry.

The following is the similar 12 Pa.C.S. § 5104(b) listing of "factors" to be considered in determining fraudulent intent:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation as incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who

transferred the assets to an insider of the debtor.

In the following analysis, we will reference the § 548(a)(1) badges by their number in the foregoing list prefixed by the letter "B" (for "badge"), *e.g.*, B1, B2, etc. The Pennsylvania law factors are referenced by their subsection similar under § 5104(b) prefixed by the letter "F" (for "factor"), *e.g.*, F1, F2, etc.

■ B1 and F8 are equivalent, as are B4 and F9. These are the issues of adequacy of consideration and insolvency of the transferor, respectively, which are "the most significant" of the badges. *See Main I, supra*, 213 B.R. at 79. We also observe that these are the elements which, taken together, are sufficient to establish a constructive fraudulent conveyance. Therefore, we will give these issues somewhat extended consideration at the outset.

■ With respect to the adequacy of consideration, the Debtors are faced with the repeated, and in themselves almost conclusive, statements of the Debtor admitting that MAI received no payments whatsoever for the loss of its lucrative and recently-expanded service department. The Debtor now argues that the Trustee failed to quantify the service department's value and the ADI paid some of MAI's obligations as sufficient consideration for the transfer.

These arguments ring very hollow. The service department clearly has some considerable value, even if that value is created entirely by the Debtor's personal expertise. This business guarantees a salary of $2500 weekly for the Debtor. There is little doubt that this value motivated the Debtor in appropriating this component of MAI to ADI. Since there was no give-and-take bargaining or negotiation, but simply a seizure of this asset without any negotiation or payment, we cannot conclude that any consideration at all was given. It is clear to us that the value of the asset transferred, while difficult to measure precisely, is considerably more than the nothing given in return.

The fact that ADI may have taken over certain of MAI's obligations subsequent to the transfer is neither surprising nor particularly relevant. Since the benefits of the service department were removed from MAI, it could be logically expected that the burdens of that asset would be and clearly should have been assumed by ADI as well. The lack of reliable records and our refusal to accept the handwritten, Debtor-contrived monthly records produced by DiPaolantonio as evidence that ADI paid slightly more obligations of MAI than MAI paid obligations of ADI renders any determination of this issue impossible at this time. It is clear that MAI, in addition to losing its crown jewel to ADI, additionally bore certain of ADI's expenses for some period. It is thus bad enough that MAI lost its most valuable asset without any real consideration in exchange. It is nothing short of monstrous to expect that MAI would bear any of ADI's expenses in addition. ADI should clearly bear all of its own expenses. We cannot in any sense attribute the lightening of MAI's financial burdens to support its service department as any real consideration to it whatsoever. We note that, seven months later, despite the fact that it was under the renewed tutelage of the Debtor for over four months, MAI, without its service department which remains healthy to this day, collapsed and went out of business.

We therefore have no hesitancy in concluding that MAI received no consideration whatsoever for the transfer of its most valuable asset to ADI, and that B1 and F8 are clearly satisfied in this transaction.

■ We next pass to the issue of MAI's insolvency prior to or as a result of the transfer, as referenced in B4 and F9. There is little doubt, as we stated in, *e.g.*, *In re Joshua Slocum, Ltd.* 103 B.R. 610, 621 (Bankr.E.D.Pa.1989), *aff'd*, 121 B.R. 442 (E.D.Pa.1989), that, as to § 548(a),

[i]nsolvency is defined by the Bankruptcy Code as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation," exclusive of property exempted under § 522 of the Code or fraudulently transferred. 11 U.S.C. § 101(31); 2 COLLIER [ON BANKRUPTCY], *supra*, ¶ 101.31[1], at 101–74 [ (2d ed.1989) ]. The Code requires the use of a "balance sheet"

test for insolvency, comparing assets to debts. *[In re] Pinto,* ... 98 B.R. 200, 209 [ (Bankr.E.D.Pa.1989), *rev'd on other grounds sub nom. Pinto v. Philadelphia Fresh Food Terminal Corp.,* 1989 · WL 234516 (E.D.Pa. Aug. 25, 1989) ]; *In re Art Shirt Ltd.,* 68 B.R. 316, 322 (Bankr.E.D.Pa. 1986), *aff'd,* 93 B.R. 333 (E.D.Pa.1988); and *In re Corbett,* 80 B.R. 32, 37–38 (Bankr.E.D.Pa.1987).

The relevant Pennsylvania law is codified in 12 Pa.C.S. §§ 5102(a), (b) as follows:

### § 5102. Insolvency

(a) **General rule.**—A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets.

(b) **Presumption of insolvency.**—A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent. This presumption shall impose on the party against whom the presumption is directed the burden of providing that the nonexistence of insolvency is more probably than its existence.

The provisions of §§ 5102(a) and (b) superseded the previously-applicable broad common-law definition of insolvency, *cf. In re Fleet,* 89 B.R. 420, 424–25 (E.D.Pa.1988), and appears to refine the Pennsylvania law, of which we stated, in *Joshua Slocum, supra,* 103 B.R. at 620, that,

[a]s we noted in *[In re] Pinto Trucking Service, [Inc.,]* ..., 93 B.R. [379], at 388 [ (Bankr.E.D.Pa.1988) ], persuasive authority exists which "suggests that, if the creditor or party attacking a transfer as fraudulent meets the burden of proving inadequacy of consideration, the burden of defense of the transferee's [sic] solvency passes to the party seeking to uphold the transfer." *See United States v. Gleneagles Investment Co.,* 565 F.Supp. 556, 557 (M.D.Pa.1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Co. v. United States,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *In re Pinto,* 98 B.R. 200, 209 (Bankr.E.D.Pa.1989) [*rev'd. sub nom. Pinto v. Philadelphia Fresh Food Terminal Corp.,* 1989 WL 234516 (E.D.Pa. Aug. 25, 1989) ]; *In re Leinheiser,* 51 B.R. 164, 166 (Bankr.E.D.Pa.1985); *Baker v. Geist,* 457 Pa. 73, 78, 321 A.2d 634, 637 (1974); and *Farmers Trust Co. v. Bevis,* 331 Pa. 89, 91, 200 A. 54, 55 (1938).

The absence of Schedules makes it unusually difficult to ascertain the value of the assets and liabilities of MAI. However, the record permits us to draw some rather clear inferences on the subject of MAI's assets and liabilities. MAI never has owned any real estate and ceased doing business in December 1997. Presently, all of its remaining saleable and hence valuable assets were liquidated in the going-out-of-business sale conducted by the Debtor which netted him approximately $55,000. Meanwhile, the Goldsteins, as noted at page 14 *supra,* are "creditors" of MAI who have a "claim" of about $400,000 against MAI, which is recorded on its own records as a debt against it.

Furthermore, the records of MAI's large number of delinquent accounts payable referenced by the Trustee in his post-trial brief indicates that MAI had numerous other liabilities as of May 1997. Indeed, MAI's accounts payable reports indicate that its debts at that time amounted to $642,988.65, $558,-398.64 of which were more than 60 days past-due. While $384,230.89 of the total and due–over–60–days amounts consisted of the indebtedness owed to the Goldsteins, it is apparent that considerable other debts existed also.

We conclude that this evidence is sufficient to establish the insolvency of MAI under the Bankruptcy Code and § 5102(a) standard or by a preponderance of the evidence. However, it is equally clear that MAI was not generally paying its debts as they became due, which triggers the application of § 5102(b). As the Trustee points out from examining MAI's records of accounts receivable in April and June 1997, MAI's dismal financial circumstances, featuring many long overdue payment accounts, was chronic. In fact, the Debtor's articulated reason for stripping MAI of its service department was its inability to pay its bills, particularly to the supplier of the fish provided to Bloomberg.

Although the Debtor attributes MAI's constant delinquencies to Robert's mismanagement, there is no evidence of Robert's culpability and ample testimony from the Debtor himself that, for whatever reason, MAI's debts were not being generally paid when they became due.

The Debtors have presented no evidence tending to rebut the presumption of insolvency arising from MAI's general non-payment of its debts in timely fashion pursuant to 12 Pa. at C.S. § 5102(b). Therefore, insolvency is alternatively proven on this basis as well.

■ As we noted at pages 875–76 *supra*, the Trustee's ability to prove MAI's lack of receipts of "reasonably equivalent value" in exchange for its service department, and MAI's insolvency before and as a result of the transfer, satisfy the requirements for proving a constructive fraudulent conveyance of this asset pursuant to § 548(a)(2) and 12 Pa.C.S. § 5104(a)(2). That is all that the Trustee need prove to succeed on his principal substantive claim that a fraudulent conveyance of MAI's service department to ADI had occurred. However, we can go further and, by examining the remaining badges of fraud and factors relevant to ascertainment of fraudulent intent appearing in the applicable Pennsylvania law, can further easily conclude that actual fraud, leading to the same conclusion on alternative grounds, has been proven by the Trustee on this record as well.

B2, B10, and F1 involve similar considerations relating to the closeness of the relationship of the transferor and the transferee. The Debtors are the owners of both the transferee (MAI) and the transferor (ADI). This element is easily proven.

Similarly, B3 and its equivalent F2 are easily proven. The Debtor remained in possession and control of the service business at all times.

B4 and F9 relate to insolvency and have already been discussed. B5 and F5 are also satisfied. As of January 1998 the asset of MAI transferred was its only component which remained viable.

B6 and F3 are satisfied. The transfer was secretly conceived and was effected by the Debtor unilaterally and suddenly, surprising even his trusted employee DiPaolantonio.

B7, which has no F equivalent, is satisfied. As its sole owner, the Debtor had a fiduciary, trust-like relationship with MAI and, in light of MAI's insolvency, to its creditors. *See, e.g., In re Kasal,* 217 B.R. 727, 734 (Bankr. E.D.Pa. 1998), *aff'd sub nom. Casey v. Kasal,* 223 B.R. 879 (E.D.Pa.1998).

The considerations referenced in B8 and B11, which are echoed in F4 and F10, speak to the financial status of the transferor and particularly to whether circumstances exist which would suggest that the transfer was effected to hinder or delay creditors. There is little question that MAI was in the throes of a fatal downward spiral. There is also little doubt that the transfer was effected with the interests of the Debtors in mind and with little or no concern about its critical impact on MAI. It also appears that a strong motivation was to hinder or delay the Goldsteins in recouping their loans. All of these criteria are therefore satisfied.

B9 is not applicable because there was no instrument at all which effected the transfer. The absence of this factor is therefore scarcely comforting. B6 and B11 were not aspects of the instant transaction, although, in a sense, the Debtors' resort to bankruptcy was a form of absconding. There was no lienor involved in the instant transaction, which factor appears to have been the sole basis for the reversal of the *Main I* decision. Rather, the transfer was a bold and direct seizure of MAI's assets by the Debtor, with little or no embellishment.

■ We therefore conclude, with no hesitation, that the Debtors' transfer of MAI's aquarium service business to ADI constituted a fraudulent conveyance of the transferred asset. As a result, the Trustee is entitled to a proprietary interest in ADI's assets. A more difficult issue is determining what remedy will be both proper and effective.

2. *The Trustee Is Entitled to an Accounting of All of the Defendants' Financial Activities from January 1, 1997, to Date, Although Imposition of a Final Remedy Appears Inappropriate at This Juncture.*

The Trustee proposes a sweeping set of remedies—transfer of all of ADI's assets and

income over the past 17 months to him; placing the business of ADI and the salary of the Debtor strictly under his control; an accounting by the Debtors of their own financial affairs and those of MAI and ADI from the beginning of 1997 forward; and monetary damages in a presently-unliquidated sum.

The Bankruptcy Code specifies no remedy for a fraudulent conveyance except avoidance of the transfer. Pennsylvania state law provides as follows, at 12 Pa.C.S. § 5107:

### § 5107. Remedies of creditors

(a) **Available remedies.**—In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in sections 5108 (relating to defenses, liability and protection of transferee) and 5109 (relating to extinguishment of cause of action), may obtain:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by applicable law.

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

(i) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(ii) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(iii) any other relief the circumstances may require.

(b) **Execution.**—If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, subject to the limitations of sections 5108 and 5109, may levy execution on the asset transferred or its proceeds.

■ One remedy sought by the Trustee is an accounting of apparently all financial aspects of MAI, the Debtors, and ADI from the beginning of 1997 to date. The Debtors' opposition to this relief appears to be that the Trustee already has taken a F.R.B.P. 2004 examination of the Debtors, and that any further requirements to provide information will distract from the Debtors' own Chapter 11 reorganizational effects. A statement is also made that this court lacks power to grant this remedy.

We agree that some sensitivity to the Debtors' reorganizational efforts must be recognized by this bankruptcy court. A threshold issue, though not argued by the Debtors, is whether the automatic stay arising from their own case should protect the Debtors as to this Proceeding, which arises not out of their own case, but out of MAI's case. *See In re Lessig Construction, Inc.*, 67 B.R. 436, 443–44 (Bankr.E.D.Pa.1986). (the automatic stay applies to bankruptcy court litigation against a debtor). There is, however, ample contrary authority holding that the bankruptcy stay does not operate against the bankruptcy court in which a debtor has filed a case. *See In re Teerlink Ranch, Ltd.*, 886 F.2d 1233, 1237 (9th Cir.1989); *In re North Coast Village, Ltd.*, 135 B.R. 641 (9th Cir. BAP 1992); *In re Martin*, 162 B.R. 710, 715 (Bankr.C.D.Ill., 1993); *In re Opti–Gage, Inc.*, 130 B.R. 257, 258–59 (Bankr.S.D.Ohio 1991); and *In re American Spinning Mills, Inc.*, 43 B.R. 365, 367 (Bankr.E.D.Pa.1984) (per GOLDHABER, J.).

Subsequent to our decision in *Lessig*, we stated as follows regarding this issue in *In re FRG, Inc.*, 121 B.R. 710, 714 (Bankr.E.D.Pa. 1990):

We recently reviewed this topic in depth in *In re Sciortino*, 114 B.R. 423, 426–27 (Bankr.E.D.Pa.1990). Quoting our earlier statements which amended our holding in *Lessig, supra, In re TM Carlton House Partners, Ltd.*, 93 B.R. 859, 870 (Bankr. E.D.Pa.1988), we stated that the filing of a complaint in bankruptcy court was " 'logically the equivalent of a request for relief from the automatic stay,' " 114 B.R. at 427, rather than a violation of the automatic stay in itself.

■ The application of the principles thusly set forth in *FRG* and the cases cited therein requires us to add consideration of the Debtors' pending bankruptcy as a factor

in molding appropriate relief as to them. However, it is clear that a debtor may, in an appropriate case, be required to produce an accounting, and that a bankruptcy court does indeed have the power to so order. *See In re Fugazy Express, Inc.*, 114 B.R. 865, 876 (Bankr.S.D.N.Y.1990), *aff'd*, 124 B.R. 426 (S.D.N.Y.1991), *appeal dismissed*, 982 F.2d 769 (2d Cir.1992).

We note that, while an accounting is not among the remedies specifically referenced in 12 Pa.C.S. § 5107, that section does allow for "other relief the circumstances may require." 12 Pa.C.S. § 5107(a)(3)(iii). As the court notes in *American Air Filter Co. v. McNichol*, 527 F.2d 1297, 1300 (3d Cir.1975),

[a]n accounting is an essentially equitable remedy, the right to which arises generally from the defendant's possession of money or property which, because of some particular relationship between himself and the plaintiff, the defendant is obliged to surrender. *See Holland v. Hallahan*, 211 Pa. 223, 60 A. 735 (1905); *Shenango Furnace Co. v. Fairfield Tp.*, 229 Pa. 357, 78 A. 937, 943 (1911); *Crennell v. Fulton*, 241 Pa. 572, 88 A. 783, 785 (1913)....

*See also Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.*, 607 F.Supp. 361, 371 (E.D.Pa.1985); *In re Estate of Hall*, 517 Pa. 115, 136, 535 A.2d 47, 57 (1987) ("In a suit for accounting, it is reasonable for the court to permit some latitude since often times it is not certain what claims a plaintiff may have until the accounting is completed."); *Reigart v. Dawson*, 79 Pa.D. & C. 375, 379, 64 York 205 (Pa.Com.Pl.1951); and *Leaderman v. Royal Store Fixture Co.*, 47 Pa.D. & C. 273 (P.Com.Pl.1943).

In the instant situation, where the evidence, even from credible witnesses such as Hamilton and DiPaolantonio, is inconclusive and unsupported by firm data, we deem an accounting a most appropriate remedy. The paucity of evidence is due to the particular relationship among the Defendants. The Debtors control MAI and ADI and are perhaps the only persons who have access to data necessary to produce the requisite accounting.

Nor does this remedy appear obstructive to the Debtors' own reorganizational efforts. While we will require that they retain a professional accountant to produce the requisite accounting, we note that an accountant has already been appointed for them in their bankruptcy case.

We do not support the notion that submission to a F.R.B.P.2004 examination should insulate the Debtors from providing an accounting at this juncture. This court has now determined that the Debtors effected a wrongful appropriation of a substantial portion of MAI to their own benefit. The Trustee is, by reason of that adjudication, now entitled to a detailed report which focuses on the consequences of the wrongful transfer. *Compare In re Main, Inc.*, 1997 WL 626544, at *12 (Bankr.E.D.Pa. Oct. 7, 1997) ("*Main II* "), *aff'd, Blatstein, supra* (debtor who effected a fraudulent conveyance was required to provide to the trustee's accountant full access to his businesses' books and records despite that the order had been preceded by a long trial and significant discovery).

Finally, we will require that the accounting be done even more expeditiously than in the 60–day period requested by the Trustee, *i.e.*, by November 27, 1998. It is important to promptly complete this accounting as a first step to ascertain what other remedies may be appropriate.

Several considerations cause us to refrain from imposing any further remedies at this time, particularly immediately placing the assets and the reins of ADI in the hands of the Trustee. First is the recognition that the Debtors are in Chapter 11, and that placing pervasive and specific restrictions on their principal, if not only, source of income could be fatal to their reorganizational efforts. Such restraint is partially an exercise of the considerations arising from the automatic stay in the Debtors' bankruptcy case. It is particularly difficult to enter a monetary award against a debtor.

The second consideration is our further perception that, until the accounting which we deem necessary is completed, it is premature to quantify any appropriate monetary remedies.

· A third consideration is the practicalities of the situation. It would not be beneficial to

the Goldsteins or the Trustee to destroy ADI. *Compare In re Landes,* 201 B.R. 399, 405 (Bankr.E.D.Pa.1996) (court observes that the end result of successful efforts to allow the debtor to persist in illegally transferring his business to a newly-created entity, while effective in preventing the debtor from profiting thereby, ultimately destroyed the economic prospects of recoveries from the debtor by the allegedly wronged parties).

A fourth consideration is the inability of a Chapter 7 Trustee to operate a business except on a temporary basis to preserve its assets. *See* 11 U.S.C. §§ 704(1), 704(8); and 6 COLLIER ON BANKRUPTCY, ¶ 704.02[1], at 704–4 (15th Ed. rev.1998). It is not clear that a service-related business so dependent on the personal services of the Debtor as is ADI is marketable to anyone except perhaps the Debtor himself.

Nevertheless, having said all of the foregoing, it cannot be forgotten that the bankruptcy court is a court of law, not a fountainhead of unlimited equity and mercy to wrongdoers under the law. While we provide no specific directive placing the assets of, and income generated by, ADI in the hands of the Trustee at this point, that does not mean that, if no accommodation is reached, we will not ultimately be forced to transfer this asset to the Trustee and/or impose monetary penalties upon the Debtors. We merely direct that, at this stage, any further specific relief will be ordered only after the accounting which we will direct be promptly done is completed, its results analyzed, and a further status hearing is conducted.

We will, however, also include in our order an injunction to prevent ADI or the Debtors from transferring any of these assets to another entity pending our final disposition, similar to that entered in *Main II, supra,* at *12.

3. *The Debtors' 9011 Motion Will Be Denied.*

 The instant 9011 Motion is unusual in several important respects. Although the 9011 Motion was triggered by the withdrawn Constructive Trust Motion, the substance of which this court determined was more properly prosecuted in the instant Proceeding, it does not address the procedural deficiencies in the Constructive Trust Motion. Nor does the 9011 Motion assert that the Constructive Trust Motion lacked substantive merit, a claim which, had it even made, would have been rebutted by the within decision in the Proceeding sustaining the principal claims made in that Motion.

Rather, the 9011 Motion alleges that, in drafting the Constructive Trust Motion, Rhona and her counsel improperly attributed certain statements to the Debtor and misreferenced certain statements made by the Debtor at his F.R.B.P.2004 examination, and, for that reason, we should award the Debtors their costs and attorneys' fees of defending the Constructive Trust Motion.

The specific transgressions of Rhona and her counsel in presenting the Constructive Trust Motion referenced in the 9011 Motion can be summarized as follows:

1. The Constructive Trust Motion misstated the Debtor's testimony that he frequently worked 60 hours a week for his $2500 weekly pay.

2. ADI's gross income was said by the Debtor to be $45,000 to $50,000, not $35,000 to $40,000 as referenced in the Constructive Trust Motion.

3. Rents from the Jenkintown premises were attributed to the Debtors, when in fact these sums were totally absorbed by mortgage payments.

4. Although the Motion accurately stated that the Debtor regularly uses a vehicle titled to MAI, it failed to acknowledge Debtor's claim of ownership of the vehicle because he put the money up for it.

5. Although the underlying facts may be true, the Motion erroneously alleged that the Debtor testified that ADI took over virtually all aspects of MAI's business.

6. The Motion erroneously states that ADI gave no consideration for MAI' service department, while ADI assumed some of MAI's obligations to pay off certain of the service department's equipment.

7. The Motion falsely suggested that ADI pays the Defendant substantial income in

excess of his $2500 weekly salary, when it only occasionally does so.

8. The Motion insinuates that the Debtor only purchase fish for ADI to earn his $2500 weekly, when in fact he also is obliged to perform certain "paperwork."

Collecting most of our prior cases in this area, we thusly set further our generally dim view of any F.R.B.P. 9011 motions in *In re Fineberg,* 1997 WL 75251, at *1–*2, *4 (Bankr.E.D.Pa. Feb. 20, 1997):

> We recently stated, in *In re Fricker,* 197 B.R. 208, 211–12 (Bankr.E.D.Pa.1996), that "[t]his court has expressed its opinion of the proper application of F.R.B.P. 9011 on several occasions, notably in *In re Smith,* 111 B.R. 81 (Bankr.E.D.Pa.1990); and *[In re] Geller,* [96 B.R. 564 (Bankr.E.D.Pa. 1989) ]". In *Geller* we stated that
>
> > "[i]n the past, we have made plain our distaste for use of B. Rule 9011(a) and our belief that it should be very narrowly construed and applied." Thus, in *In re Arena,* 81 B.R. 851, 856–57 (Bankr.E.D.Pa. 1988), citing *Gaiardo v. Ethyl Corp.,* 835 F.2d 479, 482–85 (3d Cir.1987), we stated that B. Rule 9011(a) "should be sparingly employed." However, even at that, we compared the situation in *Arena* to "an 'abusive multiple-filing situation,' *compare In re Geller,* [74 B.R. 685 (Bankr.E.D.Pa. 1987) ]." In *In re Elfman,* [1988 WL 98776 (Bankr.E.D.Pa. Sept. 23, 1988),] we stated, in a brief, unpublished decision, that we would reserve application of B. Rule 9011(a) for use "only in 'exceptional circumstances,' where counsel's work product is patently frivolous and/or his motivations are improper, [id. at *1], citing *Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90, 99 (3d Cir.1988)." *Id.* at 567. Subsequently, in *Smith,* 111 B.R. at 85, we quoted the foregoing passage in *Geller* as our 'synthesis' of the proper application of F.R.B.P. 9011.

> . . . . .

> Finally, we note that, even if we were to find the Trustee liable, the Defendants are incorrect in assuming, ... that fee-shifting would necessarily be the appropriate penalty. See *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 553, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991); *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 409, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Zuk v. Eastern Pa. Psychiatric Institute of the Medical College of Pa.,* [103 F.3d 294, 301 (3d Cir.1996) ]; and *Fricker, supra,* 197 B.R. at 214–15. We have never imposed such a penalty for F.R.B.P. 9011 violations. *See Geller, supra,* 96 B.R. at 569.

Moreover, in *Fineberg* the 9011 movants had been completely successful in defending themselves in an expensive and rather creative lawsuit. *Id.* at *1. Nevertheless, because the Trustee's actions had some reasonable basis, the filings were found neither patently frivolous nor driven by improper motives, and the motion was denied. *Id.* at *2–*3.

By way of contrast, herein we have sustained much of the substance of Rhona's allegations in the Constructive Trust Motion. We have set out the Debtors' specific allegations at length at pages 35–36 *supra* mainly to show how trivial these claims are. In many instances, the allegations and inferences expressed in the Constructive Trust Motion were right on the mark. In any event, the appropriate relief would be unlikely to be some sort of fee shifting to the Debtors, as they request.

In sum, the instant 9011 Motion exemplifies some of the worst aspects of such motions. It represents an apparent attempt to intimidate the movant for engaging in vigorous but totally proper advocacy. The only matter which approaches impropriety is the 9011 Motion itself, which in our view erroneously attempts to characterize Rhona's proper advocacy as in some way improper.

Therefore, without hesitation, the instant 9011 Motion will be denied.

## D. Conclusion

An order effectuating our within decision will be entered.